IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SERVIDYNE, INC. (f/k/a Abrams           )
Industries, Inc.),                       )
                                         )
        Plaintiff,                       )
                                         )         CIVIL ACTION FILE
v.                                       )
                                         )         NUMBER 1:07-cv-96-TCB
ST. PAUL MERCURY                         )
INSURANCE COMPANY,                       )
                                         )
        Defendant.                       )

## O R D E R

### I.   Background

In 2002, Plaintiff Servidyne, Inc., f/k/a Abrams Industries, Inc.,

obtained a directors and officers liability policy from Defendant St. Paul

Mercury Insurance Company for the period May 1, 2002, through May 1,

2003.   In addition, Servidyne purchased coverage from St. Paul for an

extended discovery period, which lengthened the time for reporting claims

to May 1, 2004.

The policy generally required St. Paul to reimburse Servidyne for losses incurred in indemnifying its directors and officers against claims brought against them during the policy and discovery periods.

In the spring of 2003, while the policy was in effect, Servidyne discovered that B. Michael Merritt, then president and chief executive officer of Abrams Construction and an officer and member of Servidyne's board of directors, may have conspired with certain competitors and others to fix the price of project bids for construction projects for one of Servidyne's customers. This conduct potentially violated Section 1 of the Sherman Act, which makes it a crime to engage in bid rigging. 15 U.S.C. § 1.

Servidyne undertook an internal investigation of Merritt's conduct and communicated the results of its investigation to the United States Department of Justice, seeking to participate in the DOJ's amnesty program.

On July 1, 2003, the DOJ issued a conditional letter of amnesty promising not to criminally prosecute Servidyne or its directors, officers or employees. In return, the DOJ required full cooperation from Servidyne.

its directors, officers, and employees during the government's investigation of the alleged misconduct.[1]

On July 22, 2003, in conjunction with the DOJ's investigation, a grand jury issued a subpoena compelling Servidyne to produce thousands of pages of documents and materials relevant to the investigation. Servidyne complied with the subpoena by producing voluminous documents and other materials.  Compliance was not cheap; Servidyne spent almost $700,000 in attorneys' fees and expenses in response to the subpoena.[2]

Approximately a month later, Servidyne received a letter from the Securities and Exchange Commission dated August 28, 2003, notifying Servidyne that the SEC had also undertaken an investigation of Servidyne and seeking documents in furtherance of that investigation.

---

[1] The grant of amnesty specifically excepted Merritt.  Merritt resigned from Servidyne in June 2003.

[2] St. Paul notes in its motion to dismiss that it "does not concede that [Servidyne] . . . in fact indemnified any individual [d]irector and/or [o]fficer."  However, because this case is before the Court on St. Paul's motion to dismiss under Rule 12(b)(6), the allegations in the complaint must be accepted as true and construed in the light most favorable to Servidyne. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

It is undisputed that Servidyne timely notified St. Paul of Merritt's conduct and the two governmental investigations and that St. Paul was on notice that the investigations could constitute claims against Servidyne's directors and officers, thereby triggering coverage obligations under the policy. It is also undisputed that Servidyne cooperated with St. Paul's requests for information and otherwise satisfied all conditions precedent to coverage under the policy.

On January 18, 2005, St. Paul sent Servidyne a letter denying coverage for the expenses Servidyne incurred in conjunction with the DOJ and SEC investigations.[3]

On March 29, 2005, Servidyne demanded payment of its losses from St. Paul and advised St. Paul that it considered the denial of coverage to be in bad faith, in violation of O.C.G.A. § 33-4-6.

On January 12, 2007, Servidyne brought this action, seeking a declaration that St. Paul is obligated to pay all losses incurred as a result of Servidyne's indemnification of its directors and officers in conjunction with

---

[3] In total, Servidyne spent over $1.4 million in connection with the DOJ and SEC's investigations.

the DOJ and SEC investigations, compensatory damages for breach of contract, and bad faith damages pursuant to O.C.G.A. § 33-4-6.

St. Paul now moves to dismiss Servidyne's complaint for failure to state a claim upon which relief can be granted.[4]  St. Paul contends that no coverage exists because the costs Servidyne incurred do not fit within the parameters of the policy.  Specifically, St. Paul argues that the losses Servidyne sustained were not in response to a "claim," nor were they against an "insured person" for a "wrongful act," according to the definitions of those terms in the policy.

## II.   Discussion

### A.   Rule 12(b)(6) Standard

When a court considers a Rule 12(b)(6) motion, the allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff.  *Hill*, 321 F.3d at 1335.  However, while a complaint need not contain "detailed factual allegations, a plaintiff's

---

[4] St. Paul and Servidyne have both filed unopposed motions for leave to file supplemental briefs regarding St. Paul's motion to dismiss [26, 27].  The Court hereby grants both motions, and has considered all filings in ruling on St. Paul's motion to dismiss.

obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . . ." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (May 21, 2007) (citations omitted).  Thus, to survive a motion to dismiss, the factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" and must "state a claim to relief that is plausible on its face." *Id.* at 1974-75.  Further, "[c]onclusory allegations and unwarranted deductions of fact" will not be accepted as true, "especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint.  If the appended document . . . reveals facts [that] foreclose recovery as a matter of law, dismissal is appropriate." *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974).[5]

### B.    Interpretation of the Policy

In Georgia, the "[i]nterpretation of contracts, including insurance policies, is ordinarily a question of law for the [c]ourt to resolve." *Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F. Supp. 2d 1340, 1348

---

[5] The Eleventh Circuit has adopted as binding all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

(N.D. Ga. 2001); *see also* O.C.G.A. § 13-2-1.  When analyzing a specific term, a court must apply the term's "ordinary and common meaning, unless [it is] otherwise defined in the contract."  *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 328, 498 S.E.2d 492, 494 (1998).

However, even if a term is defined by the policy, an ambiguity in the contract may exist if there are "words or phrases [in the definition] which cause uncertainty of meaning and may be fairly construed in more than one way."  *Hallum v. Provident Life & Accident Ins. Co.*, 257 F. Supp. 2d 1373, 1380 (N.D. Ga. 2001).  Once an ambiguity is found, the "terms and phrases [that] are ambiguous . . . will be strictly construed against the insurer and in favor of the insured."  *Id.*; *see also Richards v. Hanover Ins. Co.*, 250 Ga. 613, 615, 299 S.E.2d 563-64 (1983) (stating that ambiguities in insurance provisions are to be resolved in favor of coverage and against forfeiture).

St. Paul argues in its motion to dismiss that its policy is unambiguous and can only be construed in one way.  Specifically, St. Paul alleges that three policy terms preclude coverage of Servidyne's losses as a matter of law: "claim," "insured person," and "wrongful act."

### 1.   Claim

Section III.B of the policy defines a claim as follows:

1. a written demand against any Insured Person . . . for monetary damages,

2. a civil proceeding against any Insured Person . . . commenced by the service of a complaint or similar pleading,

3. a criminal proceeding against any Insured Person, commenced by a return of an indictment, or

4. a formal civil administrative or regulatory proceeding against any Insured Person commenced by the filing of a notice of charges, formal investigative order or similar document.

Servidyne concedes that subsections 1-3 are inapplicable.[6] The issue, then, is whether subsection 4 can be interpreted to provide coverage under these circumstances.

According to Servidyne, subsection 4 applies because the amnesty letter, the grand jury subpoena, and the SEC letter each constitute "a formal investigative order or similar document," and because each document

---

[6] Subsection 1 cannot apply because there has not been any demand for monetary damages. Subsection 2 is inapplicable because no civil proceeding against Servidyne has been commenced, whether by service of a pleading upon Servidyne or otherwise. Finally, subsection 3 does not provide coverage for the expenses Servidyne incurred because no indictment has been returned.

commenced "a formal civil administrative or regulatory proceeding" against Servidyne.  St. Paul disagrees on both points.

At this stage the Court must accept Servidyne's allegations as true. *Hill*, 321 F.3d at 1335.   However, to the extent that it is clear that documents—including the policy itself—attached to the first amended complaint contradict Servidyne's assertion that coverage exists, the Court must dismiss Servidyne's pleading, because recovery is "foreclose[d] . . . as a matter of law." *Associated Builders*, 505 F.2d at 100.

The policy specifically defines what constitutes a "claim" triggering coverage.   Because claim is defined in the contract, the Court need not inquire into the term's ordinary meaning. *See Boardman*, 269 Ga. at 328, 498 S.E.2d at 494.   For this reason, Servidyne's reliance on *Richardson Elecs., Ltd. v. Fed. Ins. Co.*, 120 F. Supp. 2d 698 (N.D. Ill. 2000), and *Polychron v. Crum & Forster Ins. Cos.*, 916 F.2d 461 (8th Cir. 1990), which both hold that DOJ investigations constitute claims triggering coverage under directors and officers liability policies, is misplaced.   In those cases, "claim" had not been defined by the policy, and the courts were left to interpret the word according to its ordinary meaning. *See, e.g., Polychron*, 916 F.2d at 463.   In contrast, the St. Paul policy includes a precise

9

definition of "claim," and this Court must apply that definition when interpreting the policy. *See Hallum*, 257 F. Supp. 2d at 1380.

However, although the policy defines "claim," that definition contains an ambiguity. Subsection 4 provides coverage upon the commencement of a "formal *civil* administrative or regulatory proceeding." (Emphasis added.) Although St. Paul contends that the adjective "civil" applies to both administrative and regulatory proceedings, and that this is the only reasonable interpretation of the language, the Court disagrees. Rather, the phrase can be read in two ways: "Civil" can be read to modify the entire phrase "administrative or regulatory proceeding" or just to modify "administrative . . . proceeding." If the former, then coverage applies only when *civil* administrative or *civil* regulatory proceedings are commenced; if the latter, coverage applies when *civil* administrative or *any* regulatory proceedings are commenced. *Cf. Hunter v. Bailey*, 101 F.3d 1565, 1574 (11th Cir. 1996) (finding the phrase "circuit justice or judge" ambiguous because the adjective "circuit" could apply to both "justice" and "judge" or only "justice").

In fact, at least one other directors and officers liability policy has explicitly defined "claim," in relevant part, as a "formal civil administrative

or *civil* regulatory proceeding . . . ." *In re Tower Automotive, Inc.*, No. 05-10578(ALG), 2005 WL 3789426, at *1 (Bankr. S.D.N.Y. Sept. 19, 2005). This confirms that if St. Paul had wanted to limit coverage to civil regulatory proceedings, "it could have said it." *Richardson*, 120 F. Supp. 2d at 701.

Because an ambiguity exists in the language of subsection 4, that clause must be construed against St. Paul and in favor of Servidyne, with the result being that subsection 4 potentially applies upon the commencement of *any* regulatory proceeding. *See Hallum*, 257 F. Supp. 2d at 1380.

Therefore, subsection 4 applies to the extent that the grand jury subpoena, the DOJ amnesty letter, and the SEC investigation constitute "a formal civil administrative or [*any*] regulatory proceeding against any Insured Person commenced by the filing of a notice of charges, formal investigative order or similar document." The Court will address the application of this policy language to each of the three matters separately.

### (a)    The DOJ Amnesty Letter

Was the DOJ's July 1, 2003 amnesty letter (and the investigation that led up to it) "a formal civil administrative or [*any*] regulatory proceeding

. . . commenced by the filing of a notice of charges, formal investigative order or similar document"?  The answer is no.

Subsection 4 of the policy's definition of claim contemplates the "filing" of a formal investigative document that commences a proceeding. "Filing" is not defined by the policy, so the Court must apply its "ordinary and common meaning." *Boardman Petroleum*, 269 Ga. at 328, 498 S.E.2d at 494.  To "file" a document means "[t]o deliver [it] to the court clerk or record custodian for placement into the official record."  *Black's Law Dictionary* 660 (8th ed. 2004).  Hence, the policy contemplates coverage only when a "notice of charges, formal investigative order or similar document" has been delivered to a court clerk or to a record custodian for placement into an official record.

In this case, Servidyne has neither alleged nor proven the "filing," i.e., delivery to a court clerk or record custodian, of the DOJ amnesty letter. Therefore—even assuming that the amnesty letter, which promises the *lack* of prosecution, can be interpreted as "commenc[ing]" a "proceeding"[7]—no

---

[7] Albeit in the context of a civil settlement rather than an amnesty letter, the Northern District of Illinois has held that "a release of potential liability" does not

coverage exists as a matter of law for the efforts Servidyne underwent to obtain the amnesty letter from the DOJ, and St. Paul's motion to dismiss is granted with regard to that letter.

### (b)   The SEC Letter

The letter from the SEC to counsel for Servidyne likewise fails to meet the definitional requirements of subsection 4.  As the Court has already determined, subsection 4 contemplates the *filing* of a *formal* document that *commences* a civil administrative proceeding or a regulatory proceeding before the policy provides coverage.  However, like the DOJ amnesty letter, the SEC letter was never delivered to a court clerk or record custodian for placement into an official record, and it therefore fails to satisfy the "filing" requirement of subsection 4.

Additionally, the SEC letter includes the following language:

> The Commission conducts its investigations in this manner to preserve the integrity of its investigative process, as well as to protect persons against whom unfounded charges may be made or where the Commission determines that *enforcement action is not necessary or appropriate.*

---

constitute a claim under a directors and officers liability policy.  *Richardson*, 120 F. Supp. 2d at 704.

(Emphasis added.)   The letter itself belies Servidyne's assertion that a formal civil administrative or regulatory proceeding was commenced by the issuance of the letter.  Rather, the letter anticipates further decision-making by the SEC before an "enforcement action" *might* be pursued against Servidyne.  It is such later action—if any—by the SEC, coupled with the issuance of a formal document initiating an enforcement action, which could trigger coverage under subsection 4 of the policy.

Accordingly, because the SEC letter was not *filed* and did not initiate a proceeding, the Court grants St. Paul's motion to dismiss with regard to this document.

### (c)   The Grand Jury Subpoena

Finally, St. Paul contends that as a matter of law it has no duty to reimburse Servidyne for the expenses incurred in complying with the DOJ's grand jury subpoena and attendant investigation.  The Court disagrees.

St. Paul first asserts that subsection 4 only applies to civil administrative and civil regulatory proceedings, and that, as a result, the

DOJ's investigation of Merritt's conduct—which was criminal in nature[8]—does not trigger coverage under subsection 4.   However, the Court has already construed subsection 4 as providing coverage for *any* regulatory proceeding, whether civil or criminal, and therefore, the criminal nature of that investigation does not, as a matter of law, bar coverage for the expenses Servidyne incurred in complying with it.

Next, did the grand jury subpoena and investigation constitute a "regulatory proceeding"?   St. Paul has failed to carry its burden of showing that this question must be answered in the negative.

First, the grand jury investigation may have been regulatory in nature.  The Fourth Circuit has construed a grand jury to be a government regulatory agency when convened pursuant to a DOJ investigation.  *See Bornstein v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 828 F.2d 242, 245 (4th Cir. 1987).  The next question, then, is whether the grand jury subpoena

---

[8] The DOJ investigation centered on Merritt's conduct, which was "violative of Section 1 of the Sherman Act, 15 U.S.C. § 1." Section 1 makes it a crime to enter into a contract "in restraint of trade or commerce," and prescribes the punishments applicable upon commission of such a crime.

and investigation constituted a "proceeding" as that term is used in the policy.

The policy does not define the word "proceeding," and it does not seem to the Court that as a matter of law a grand jury investigation cannot be considered a proceeding. In fact, even St. Paul has characterized it as such. At least three times in its briefs in support of its motion, St. Paul asserts that the subpoena was issued in conjunction with a criminal "proceeding."[9]

Because the grand jury investigation may have constituted a regulatory proceeding, if it was commenced by "the filing of a notice of charges, formal investigative order, or similar document," St. Paul's motion to dismiss must be denied.

A subpoena is "a writ commanding a person to appear before a court or other tribunal." *Black's Law Dictionary* 1467 (8th ed. 2004). A "writ" is further defined as a "court's written order . . . ." *Id.* at 1640. Therefore, a

---

[9] St. Paul's Brief [21] at 16 ("The Subpoena was issued in conjunction with a criminal investigation or proceeding . . . .") and 25 ("the Subpoena . . . [was] issued in conjunction with a criminal, not civil, proceeding"); St. Paul's reply brief [24] at 6 ("a grand jury proceeding is clearly criminal in nature . . . .").

grand jury subpoena is a court's written order commanding a person to appear before a grand jury and clearly satisfies subsection 4's requirement of a "formal . . . order."

Further, the purpose of a grand jury subpoena and the investigation that follows is to investigate charges. *See U.S. v. Sells Eng'g, Inc.*, 463 U.S. 418, 421 (1983).   Thus, a grand jury subpoena satisfies the final requirement that a regulatory proceeding be commenced by the filing of a formal *investigative* order.

Consequently, the Court cannot hold that as a matter of law the policy's definition of "claim" bars Servidyne's recovery of the expenses it incurred in complying with the grand jury subpoena and attendant investigation.

### 2.    Insured Person and Wrongful Act

St. Paul asserts that even if the amnesty letter, the grand jury subpoena and the SEC letter commenced proceedings against Servidyne, and otherwise met the policy's definition of "claim," no coverage exists because those claims were not made against "insured persons" for "wrongful acts."   Since the Court has already found that neither the amnesty letter nor the SEC letter satisfies the policy's definition of claim,

the grand jury subpoena is the only document for which the Court must undertake this inquiry.

Section III.H of the policy, in relevant part, defines insured persons as "any one or more persons who were, now are or shall be duly elected or appointed directors or officers" of Servidyne. St. Paul first argues that since the grand jury subpoena was addressed to Servidyne and not its directors, officers or employees, the alleged claim was not made against an insured person.

St. Paul further argues that because the subpoena did not explicitly identify the directorial conduct at issue, the investigation did not concern a wrongful act. Section III.S of the policy, in relevant part, defines a wrongful act as "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any of the Insured Persons in their capacity as such . . . ."

The Eighth Circuit has found it unnecessary for a grand jury subpoena to list a director by name or describe the conduct at issue for it to constitute a claim against an insured person for a wrongful act.  *See Polychron*, 916 F.2d at 461.  In *Polychron*, the Internal Revenue Service issued a grand jury subpoena to a national bank.  No directors or officers

18

were specifically named in the subpoena, nor were wrongful acts described. However, the court held that a claim had been made against an insured person for a wrongful act because the "documents demanded . . . related to the [director's] conduct as a bank official." *Id.* at 463.

Further, the portions of the policy that define insured person and wrongful act do not expressly limit coverage to situations where the director and the director's conduct are named in the document. If St. Paul had wanted to limit coverage in this manner, "it could have said it." *Richardson*, 120 F. Supp. 2d at 701.

Accordingly, because the Court has already determined that subsection 4 of the definition of claim may cover the grand jury subpoena and the attendant investigation, and because the Court finds that there is no requirement in the policy that the subpoena explicitly name the director or describe the conduct at issue, the Court cannot rule that as a matter of law coverage is precluded, and St. Paul's motion to dismiss must be denied to the extent that Servidyne seeks reimbursement of its expenses incurred in response to the grand jury subpoena.

## C.   Bad Faith Damages

In the third count of its first amended complaint, Servidyne alleges that St. Paul's denial of coverage was in bad faith, entitling it to recover damages and attorneys fees pursuant to O.C.G.A. § 33-4-6.  However, the Court has found that St. Paul had no duty to reimburse Servidyne for the expenses associated with the DOJ amnesty letter or the SEC letter.  Further, the Court's determination that coverage potentially exists for the expenses associated with the grand jury investigation relies on the existence of an ambiguity in the insurance contract.  By definition this means that at least two potential constructions of the policy exist, and it cannot be said that St. Paul has not provided a "reasonable defense" to payment of Servidyne's losses.  Therefore, the imposition of bad faith damages is unauthorized as a matter of law.  *See Gen. Accident Fire & Life Assurance Corp. v. Azar*, 103 Ga. App. 215, 222, 119 S.E.2d 82, 86-87 (1961).  Accordingly, the Court grants St. Paul's motion to dismiss Servidyne's claim for bad faith damages.

## III.  Conclusion

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss Plaintiff's first amended complaint [21].

and GRANTS Plaintiff's and Defendant's motions for leave to file supplemental briefs [26, 27] as unopposed.

IT IS SO ORDERED this 7th day of November, 2007.

Timothy C. Batten, Sr.
United States District Judge